IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :          CRIMINAL ACTION
                                  :
          v.                      :
                                  :
ALEXANDER RIVERA                  :          NO. 10-130

MEMORANDUM

Dalzell, J.                                       July 22, 2010

     The Government charges Alexander Rivera with one count
of felon in possession of a firearm, in violation of 18 U.S.C. §
922(g)(1). Rivera moves to suppress evidence that law enforcement
officers seized on June 1, 2009, most significantly the firearm
and ammunition that he is charged with illegally possessing.

     Upon consideration of the testimony and evidence that
we heard at yesterday's hearing, we conclude that Rivera's parole
officer -- who conducted the initial search on June 1, 2009 and
found the gun and ammunition in the trunk of a car that Rivera
had been driving -- did <u>not</u> have reasonable suspicion to search
the trunk. We will therefore grant the motion to suppress as to
the gun and ammunition, but deny it to the other evidence that
Rivera seeks to suppress.

## I.    **Findings of Fact**

On June 1, 2009, Rivera was a parolee under the supervision of the Commonwealth of Pennsylvania Board of Probation and Parole. Rivera was subject to many parole conditions and, among other things, could not (1) "operate a motor vehicle without a valid Pennsylvania Drivers License, proof of financial responsibility and [his] parole agents [sic] written permission" or (2) "associate with drug users or drug dealers outside of a treatment program." Special Conditions of Parole for Alexander Rivera, Gov't Ex. 1 at 2 (dated August 16, 2008).[1] Rivera also signed a form that stated, "I expressly consent to the search of my person, property and residence, without a warrant by agents of the Pennsylvania Board of Probation and Parole. Any items, in the possession of which constitutes a violation of parole/reparole shall be subject to seizure, and may be used as evidence in the parole revocation process." Conditions Governing Parole/Reparole of Alexander Rivera, Def. Ex. D-2.

Rivera's parole officer, Shante Crews, was the sole witness at yesterday's hearing regarding Rivera's motion to suppress. According to her uncontested testimony, Crews

---

[1] At the hearing, Rivera did not dispute that he was subject to these special parole conditions.

supervised Rivera for about ten months before his arrest for this offense. Rivera was obliged to meet with Crews at her office on the first Monday of every month, and he could arrive for the meeting at any time between 8:30 a.m. and 5:00 p.m. He was also subject to a monthly urinalysis test, which apparently happened during these monthly office meetings. Crews also made unscheduled visits to Rivera's home.

As Crews's supervision of Rivera progressed, she became concerned that Rivera was rarely home when she made her unscheduled visits, especially during the times when he was unemployed, and she was annoyed that Rivera often came to her office for their monthly meetings shortly before the office closed at 5:00 p.m. She testified that in her experience parolees arrive late in the day so that she would have little time to spend with them before the office closed. Since Rivera was unemployed during the events at issue here, Crews had asked him to come to their monthly meetings earlier in the day.

But on June 1, 2009, Rivera ignored Crews's requests and appeared for his monthly meeting around 4:45 p.m. He told Crews that he overslept, and she "verbally reprimanded" him for arriving at the office late in the day and for his frequent absences from his house. During their conversation, Crews noticed

3

that Rivera was "antsy" and not paying attention to her. Crews thought that Rivera behaved this way because she reprimanded him. She also believed that Rivera was sending text messages on his cell phone while she spoke with him, but he told her that he was not doing so. Rivera showed Crews the "home screen" of his phone, and Crews did not see any text messages at that time.

Rivera gave Crews a urine sample, and she performed an "instant test" at her desk by inserting a testing card into the sample. Crews testified that if a line appeared on the card, the sample was <u>negative</u> for drug use, but if <u>no</u> line appeared on the card the sample was <u>positive</u> for drug use. She told us that Rivera's sample showed a "faint line" by the marijuana indicator, which was an equivocal or unclear result. Crews asked Rivera if he used marijuana, and Rivera told Crews that he did not use marijuana himself but that he had spent time with friends who did.

Crews recognized that associating with drug users was a violation of Rivera's parole conditions, and she "verbally reprimanded" him for <u>that</u> issue. She told us that she was also concerned that Rivera had committed other unspecified violations and wanted to speak to her supervisor. She placed the defendant in handcuffs and other restraints and searched him. She removed

4

his wallet and a set of car keys from his pockets. Crews had not given Rivera permission to drive any vehicle, so she asked him whose keys were in his pocket. He told her the keys belonged to a friend or girlfriend and that he drove her car to the parole office. She "verbally reprimanded" him again. Another parole officer then took Crews to a holding cell, and Rivera talked with her supervisor. Crews testified that as Rivera was led to the holding cells he was "very adamant" that someone would pick up the car keys. She said this was unusual because detained parolees are typically concerned about whether they will be sent back to jail, not whether their property will be safe.

Crews's supervisor gave her permission to search Rivera's car, but she did not know which car Rivera had driven to the office. She took the car keys that she had found in his pocket, went outside, and pressed the unlocking button on the key fob until she heard a beeping sound from a gold Nissan. Crews unlocked the trunk of that car,[2] and a colleague of hers went to the front of the car. She saw a hooded sweatshirt in the trunk and lifted it up. Under the sweatshirt, Crews saw a gun and a drum with ammunition. She then looked in the back seat of the car

---

[2] Crews unequivocally testified that she searched the trunk of the car <u>before</u> any other part of the car.

and saw gloves, a mask, and a shoe string that appeared to be tied in a noose. Crews ran back to her office and told her supervisor what she had found and the supervisor then called the police.

Crews went to her desk and searched Rivera's wallet and cell phone. She found several pieces of paper that had information about guns and related accessories, firearm-related Web sites, and several measurements labeled as, for example, the height, weight, and chest of an unspecified person. When Crews looked at Rivera's cell phone, she discovered that he <u>had</u> sent a text message during their meeting. In the message -- which Rivera sent to an unidentified person -- Rivera wrote that he thought that his parole officer would lock him up and that someone named "Ream" would have the car keys.

At the hearing, we asked Crews several questions regarding her motivation and justification for searching the car and especially its trunk. We had this exchange with Crews:

> THE COURT: ... And so the reason that you went to the car was what exactly?

> THE WITNESS: The reason why I went to the car -- well, the violation is for the urine -- I mean, no, the violation is for him associating with drug users, his behavior as far as him being antsy, in a rush, him not being home, him coming in late.

THE COURT: Well, what did that have to do with the car?

THE WITNESS: The fact that he didn't have permission to drive.  Why are you driving someone's car you didn't have permission to drive?

THE COURT: No, I understand that, but what I'm getting at is why did you pop open the trunk?

THE WITNESS: Well, we searched the entire car.

THE COURT: The question is why?

THE WITNESS: To find, you know, possible violation, technical violations.

THE COURT: Okay.  And so that was because he wasn't supposed to be driving a car, or was it because of the urine test?

THE WITNESS: All of those combined.

THE COURT: Because, what I don't understand about the urine test, if I understand you correctly, the urine test was equivocal, right?  I mean, it was not clear one way or the other?

THE WITNESS: Yes.

THE COURT: Am I right about that?

THE WITNESS: Yes.

THE COURT: I'm just trying to interpret what you said.

THE WITNESS: Yes.

THE COURT: So, but that's not why you searched the car, is it -- or is it?

THE WITNESS: No, I searched the car because, again, he was driving without my permission, he was operating the vehicle that I had no knowledge of, and then that was the main reason, but in combination of his behavior and him violating, as far as hanging around people who are using drugs. So that led me to believe that something else other -- else is going on with Mr. Rivera, because I noticed this type of behavior, the way he was acting.

In the Government's brief, it asserted that Rivera committed "two parole violations, i.e. not being home when required and the presence of narcotics in his system." Gov't Br. at 2. But Crews unequivocally testified that on June 1, 2009 she believed Rivera had violated his parole conditions by driving a car without her permission and associating with drug users. The Government argued in its brief that "the presence of marijuana in the defendant's system created the reasonable suspicion that the defendant had contraband in the car he had used to drive to the parole office." Id. at 6. But Crews told us under oath that the results of the drug test were unclear, and she notably did not testify that she searched the car or its trunk to look for drugs or related contraband.

After the exchange that we quote above, the Government asked Crews if she thought there was evidence of parole violations in the car, and Crews responded affirmatively. We specifically find that this statement is not credible. In response to direct questions from the Court, Crews never said what kind of evidence she suspected might be in the car or its trunk, and she did not articulate any _specific facts_ that could support a reasonable belief that there was _any_ evidence in the trunk related to Rivera driving without her permission, spending time with people who were drug users, or any other parole violation. To the contrary, Crews forthrightly testified that her purpose was "[t]o find, you know, possible violation, technical violations." Crews _knew_ that she had not given Rivera permission to drive a car, and she did not explain what evidence could possibly be in the trunk of Rivera's friend's car that would bolster this antecedent personal knowledge. Crews also did not tell us that she expected to find any evidence in the trunk regarding Rivera's association with drug-using friends.[3]

---

[3] The burden is on Crews to explain why she conducted the search, but we nonetheless cannot imagine what evidence _could_ have been in the trunk regarding either of these issues. It would be quite odd, for example, to look in the trunk first for registration and insurance information for the vehicle or to

(continued...)

## II.  **Analysis**

In Rivera's <u>pro se</u> motion,[4] he moves to suppress (1) the gun and "drum type magazine" that Crews found in the car trunk, (2) his cell phone and all statements or testimony about it, (3) his wallet and the paperwork in the wallet, (4) the keys, (5) statements or testimony regarding <u>any</u> of these items, (6) the "interview reports, statements and testimony of Lakesha Whaley," (7) "[a]ll bills, receipts and paperwork [in] relation to Mak 90 fiberstock," (8) "UPS tracking sheets," and (9) "[a]ll Rush Card statements and receipts."  Def.'s Omnibus Pre-Trial Mot. at 4.

Rivera did not present any evidence to support his motion to suppress the evidence in numbers (6), (7), (8), or (9), and we will therefore deny his motion on those points. We will discuss the other issues in detail. We will first address whether to grant Rivera's motion to suppress his keys, cell phone, and wallet, as well as statements and testimony regarding those

_____

[3] (...continued)
expect to find Rivera's drug-using friends lurking there.

[4] As we granted Rivera's request to represent himself after the <u>Peppers</u>-requisite colloquy, we address his <u>pro se</u> motion though it amplifies his former (now standby) counsel's cognate motion.  After we granted Rivera's request, we gave the Government the opportunity to file a response to the <u>pro se</u> motion, but the Government elected to rely on the response that it filed to the counselled motion.

items. We will then turn to the issues regarding the gun and
ammunition that Crews found in the trunk.

## A.   **Rivera's Detention and the Search of His Person**

Crews testified -- and Rivera presented no evidence to
the contrary -- that during her meeting with Rivera on June 1,
2009, the defendant told her that he had spent time with people
who smoked marijuana. There is no suggestion that Rivera was
around these people as part of a drug treatment program, and we
conclude that Crews had probable cause to believe that Rivera
violated the condition of his parole that prohibited him from
"associat[ing] with drug users or drug dealers outside of a
treatment program." We also hold that Crews had probable cause to
believe that Rivera was driving a vehicle without her permission
-- another parole violation. Crews thus lawfully arrested and
detained Rivera. See United States v. Noble, 326 Fed. Appx. 125,
128 (3d Cir. 2009) (holding that an officer may arrest a parolee
for parole violations if he had probable cause to do so, i.e.,
that "'at the moment the arrest was made, . . . the facts and
circumstances within [the officers'] knowledge and of which they
had reasonably trustworthy information were sufficient to warrant
a prudent man in believing that [the suspect] had committed or

was committing an offense'" (quoting <u>Beck v. Ohio</u>, 379 U.S. 89,

91 (1964)) (alterations in original)).

In <u>United States v. Robinson</u>, 414 U.S. 218, 235 (1973),

the Supreme Court held that:

> A custodial arrest of a suspect based on
> probable cause is a reasonable intrusion
> under the Fourth Amendment; that intrusion
> being lawful, a search incident to the arrest
> requires no additional justification. It is
> the fact of the lawful arrest which
> establishes the authority to search, and we
> hold that in the case of a lawful custodial
> arrest a full search of the person is not
> only an exception to the warrant requirement
> of the Fourth Amendment, but is also a
> "reasonable" search under that Amendment.

Crews lawfully arrested and detained Rivera based on probable

cause that he committed the parole violations we discuss above.

Her "full search" of Rivera upon his arrest and detention was

therefore valid, and she legally seized his cell phone, keys, and

wallet as part of that search. We will therefore deny Rivera's

motion to suppress these items and the testimony and statements

related to them.[5]

---

[5] We conclude that it was reasonable for Crews to seize
Rivera's cell phone, but neither party has addressed the issue of
whether Crews's perusal of the text messages that were stored on
Rivera's cell phone was reasonable. We thus do not reach that
particular issue, and we reserve decision on it for another day –
(continued...)

## B.  The Search of the Car Trunk

We now turn to Rivera's motion to suppress the gun and ammunition that Crews found in the car trunk. In United States v. Baker, 221 F.3d 438 (3d Cir. 2000), our Court of Appeals held that evidence that a parole officer found in the trunk of a parolee's car must be suppressed because the parole officer in that case did not have reasonable suspicion to search that trunk. Id. at 444-45. Our Court of Appeals addressed the issue of "whether the standard Pennsylvania Board of Probation and Parole consent to search form, signed by Baker[6] as a condition of his parole, authorized suspicionless searches of his person, property, and residence." Id. at 440. The panel predicted that the Supreme Court of Pennsylvania would construe that form -- which Rivera also apparently signed -- to "impl[y] a requirement that parole officers have reasonable suspicion in order to conduct a search of a parolee." Id.[7]  As the panel noted in

---

[5] (...continued)
- should it be necessary for us to reach that issue at all.

[6] Rivera agreed to the same search provision, word for word, that was at issue in Baker.

[7] The panel had certified this question to the Supreme Court of Pennsylvania, which declined to address it.  See Baker, 221 F.3d at 440.

13

Baker, "[t]hough officers may lawfully search the passenger compartment of the car incident to arrest, such a search incident to arrest does not extend to the trunk of the car." Id. at 443 (citation omitted). Because Baker, like Rivera, was a parolee, the officers did not need probable cause and a warrant to search the trunk because for parolees "the requisite level of suspicion is reduced and a warrant is not required." Id. (discussing Griffin v. Wisconsin, 483 U.S. 868, 871-71 (1987)). Rather, a parole officer may search a Pennsylvania parolee's car or home if she has reasonable suspicion and "reasonably believes that it is necessary to perform [her] duties." Id. at 444 (internal quotations omitted). For such a search to be valid, the officer's decision to conduct the search "must be based on specific facts." Id. (internal quotations omitted). Notably, the decision of our Court of Appeals in Baker was based on its extensive review and discussion of Pennsylvania law. The panel wrote that "Pennsylvania would construe the consent form to include an implicit requirement that any search be based on reasonable suspicion." Id. at 448 (emphasis added).

    As we discuss below, Baker provides us with strong guidance in resolving Rivera's motion to suppress the evidence that was seized from the car trunk. Before we engage in that

analysis, though, we will address whether two significant Supreme

Court decisions since Baker have called its continued validity

into question.[8]

### 1. Developments Since Baker

In United States v. Knights, 534 U.S. 112 (2001), the

Supreme Court held that a probation officer may conduct a search

of a probationer if the officer has reasonable suspicion that he

engaged in criminal activity. Id. at 121 ("When an officer has

reasonable suspicion that a probationer subject to a search

condition is engaged in criminal activity, there is enough

likelihood that criminal conduct is occurring that an intrusion

on the probationer's significantly diminished privacy interests

is reasonable."). In Knights, the Court held that the Fourth

Amendment permitted the search of a probationer's apartment

because the detective who conducted the search had reasonable

suspicion to believe that Knights was involved in arson and other

vandalism against Pacific Gas & Electric ("PG&E"). Id. at 114-15.

Law enforcement officials noticed that the dates of these

---

[8] The parties did not address this issue in their
briefs or at the hearing, and apparently just assumed that
Baker is still good law. We nonetheless discuss it here to
explain why we are confident that Baker still provides the
governing standard for evaluating Rivera's motion to suppress.

incidents coincided with Knights's court dates for theft of
services from PG&E and saw, for example, Knights's suspected co-
vandal carrying three cylindrical items, which the detective
believed were pipe bombs, out of Knights's apartment in the
middle of the night. Before searching Knights's apartment,
furthermore, a detective saw the co-vandal's truck in front of
Knights's residence and noticed that the following items were in
that truck: "a Molotov cocktail and explosive materials, a
gasoline can, and two brass padlocks that fit the description of
those removed from the PG & E transformer vault." Id. at 115. The
detective then decided to search Knights's apartment and found
incriminating evidence, which the Supreme Court held should not
be suppressed.[9]  Notably, the Supreme Court in Knights did not

---

[9] In Knights, law enforcement not only had reasonable
suspicion that Knights was committing crimes, but also that
evidence of those crimes would be in his apartment. The Supreme
Court did not discuss this issue in Knights, but we believe that
it is significant. In this case, Crews did not testify that she
believed that evidence regarding Rivera's permission to drive or
his association with drug users would be in the car trunk.
Indeed, we do not see how Crews could reasonably have believed
any such thing.
      Given that, we could only rule in favor of the
Government if we held that once Crews believed Rivera had
violated any of his parole conditions she had a blank check to
search whatever she liked. We conclude that Pennsylvania law, as
Baker interpreted it, offers more protection -- even to a parolee
like Rivera -- than that.

consider the constitutionality of a "suspicionless search" because it concluded that the officers in that case had reasonable suspicion. Id. at 120 n.6.[10]

But in Samson v. California, 547 U.S. 843 (2006), the Supreme Court took Knights a step further and held that, under California law and the Fourth Amendment, a law enforcement officer could conduct a "suspicionless search" of a California parolee. Id. at 846 ("We granted certiorari to decide whether a suspicionless search, conducted under the authority of this [California] statute, violates the Constitution. We hold that it does not."). In one case since Samson, our Court of Appeals explicitly declined to rule on the question of whether the Supreme Court's decision in Samson would alter its holding in Baker that Pennsylvania law requires that the Commonwealth's parole officers have reasonable suspicion to search Pennsylvania parolees. United States v. Henry, 360 Fed. Appx. 395, 397 (3d

_____

[10] We had occasion to address this question as it related to a fugitive parolee in United States v. Randolph, 210 F.Supp. 586 (E.D. Pa. 2002), which focused on the tension between Knights and Hudson v. Palmer, 468 U.S. 517, 525-26 (1984) (holding that prisoners have no Fourth Amendment protection against unreasonable searches). Of course, Rivera was not a fugitive while subject to Crews's supervision.

Cir. 2010). But we conclude that the Third Circuit's holding in
Baker on this point retains its vitality after Samson.

In United States v. Williams, 417 F.3d 373, 376 (3d
Cir. 2005), which our Court of Appeals decided after Knights but
before Samson, the panel stated that it did not need to determine
"whether a parole search [of a Pennsylvania parolee] can be based
on something less than reasonable suspicion" because the Court
held in Baker that Pennsylvania's parole condition of consenting
to search "'include[d] an implicit requirement that any search be
based on reasonable suspicion.'" Id. at n.2 (quoting Baker, 221
F.3d at 448). In United States v. Eggleston, 243 Fed. Appx. 715
(3d Cir. 2007), moreover, a Third Circuit panel cited Samson but
then -- without discussion -- stated that the reasonable
suspicion requirement from Knights would apply to the search of
the home of a Pennsylvania parolee who signed the search consent
form. Id. at 717.[11]

_____

[11] Our Court of Appeals stated in Eggleston that the
defendant "consented to the search," but the panel then discussed
whether the search of the defendant's residence was based on
reasonable suspicion. Eggleston, 243 Fed. Appx. at 717. From the
context of the opinion, we do not believe that the Court
concluded that Eggleston consented to the search itself, but
rather that the search consent form he signed as a parolee, which
listed his former address, extended to his new address. The Court
stated that it did "not believe that by changing residences
(continued...)

To be sure, our Court of Appeals has not since _Samson_ given us crystal clear guidance on this issue. But given that Court's statements in _Williams_ and _Eggleston_ -- and despite its equivocation in _Henry_ -- we conclude that _Baker_ remains valid after _Samson_ and that Crews must have had reasonable suspicion lawfully to search the car trunk at issue here.[12] In _Samson_, moreover, the Supreme Court ruled that a _California_ law that permitted parole officers to conduct suspicionless searches of parolees did not violate the Fourth Amendment. But _Samson_ has nothing to say about what _Pennsylvania_ law permits the Commonwealth's parole officers to do or how to construe the search waiver that Pennsylvania parolees sign. See _Samson_, 547 U.S. at 855 ("That some States and the Federal Government require a level of individualized suspicion is of little relevance to our determination whether California's supervisory system is drawn to meet its needs and is reasonable, taking into account a parolee's

---

[11] (...continued)
Eggleston had any greater expectation of privacy than on the day he signed the [search consent] form." _Id._

[12] In _Samson_, the Supreme Court stated that "parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment." 547 U.S. at 850. This distinction does not affect our application of _Baker_ to this case because Baker was, and Rivera is, a parolee.

substantially diminished expectation of privacy."). In <u>Baker</u>, the
Court of Appeals exhaustively reviewed <u>Pennsylvania</u> law to
interpret the Commonwealth's search waiver form for parolees and
determine what boundaries Pennsylvania has placed on its parole
officers. After <u>Samson</u>, we know that Pennsylvania <u>could</u> permit
its parole officers to conduct suspicionless searches of its
parolees, but there is no reason for us to believe that
Pennsylvania had made this change by June 1, 2009 or
thereafter.[13]

## 2.   Crews Did Not Have Reasonable <br> Suspicion to Search the Trunk

Applying <u>Baker</u> to this case, we conclude that Crews had
probable cause to believe that Rivera committed parole
violations, but she did <u>not</u> have reasonable suspicion to search
the car trunk. After yesterday's hearing, we believe the facts of
this case are quite similar to <u>Baker</u>'s.  The parolee in <u>Baker</u>
told his parole officer that he did not have a driver's license
and then attempted to drive away from a meeting with his parole
officer.  221 F.3d at 440. He was arrested for violating his
parole condition not to drive without a license, and parole

---

[13] The Government has made no argument, and pointed to
no cases, that would suggest otherwise.

officers then searched the trunk of the car Baker was driving.

Although the law enforcement officers in <u>Baker</u> <u>arrested</u> him for a

parole violation, the panel nonetheless concluded that they did

not have reasonable suspicion to search the trunk of the car

Baker was driving. It explained that there was no reason to think

that evidence regarding who owned the car would be in the trunk

and that neither of Baker's alleged violations -- driving without

a license or failing to show that he owned the car he was driving

-- could "give rise to a reasonable suspicion that he was

committing other, unspecified, unrelated parole violations -- the

evidence of which might be found in the trunk." <u>Id.</u> at 445.

In <u>Eggleston</u>, by contrast, our Court of Appeals held

that Pennsylvania parole agents' decision to "search [a

defendant's] residence as a result of their suspicions was

reasonable and did not violate Eggleston's Fourth Amendment

rights." <u>Eggleston</u>, 243 Fed. Appx. at 718. The panel examined

"the totality of the circumstances" and concluded that the search

was "justified." <u>Id.</u> The agents in <u>Eggleston</u> knew that the

defendant had previous drug convictions and had recently tested

positive for low levels of cocaine, which "suggested that

Eggleston was handling cocaine rather than using it." <u>Id.</u> at 716.

They also saw the unemployed defendant on a new motorcycle, heard

21

from other parolees that he was selling drugs, and noted that when they asked Eggleston for the keys to his house, he claimed to have lost them. One of the parole agents therefore "believed that Eggleston might be concealing something at his residence." Id. In other words, the officers in Eggleston articulated specific facts that objectively could support a reasonable suspicion that Eggleston had contraband at his residence. Because the agents were concerned that Eggleston was dealing drugs, it was perfectly reasonable for them to think there would be evidence of that activity in his home. But Rivera's case is quite different.

Whether Crews had reasonable suspicion to search the car trunk at issue does not present a close question. In Baker, the panel held that it was unreasonable for the parole officer to search the defendant's car trunk, even though he had committed a parole violation -- driving without a license -- that was -- at least tangentially -- connected to the car and law enforcement officers may have been concerned about who owned the car. In addressing Rivera's motion, like the panel in Baker we must decide whether Crews had reasonable suspicion to search the car trunk after she had probable cause to believe that Rivera

violated his parole by (1) driving without permission and (2) associating with drug users.

At yesterday's hearing, Crews did not offer any explanation as to why she thought that evidence of these two violations -- or any specified violations -- would be in the car trunk. She failed to point to any specific facts that could support a reasonable suspicion that such evidence would be in the trunk. In conflict with the Government's brief, Crews did not testify that she was looking for drugs or any drug-related paraphernalia in the trunk, and at the point that Crews searched the car she did not yet know about the gun-related documents that were in Rivera's wallet.

By her own testimony, Crews instead admitted she was on an ill-defined fishing expedition. She told us that she opened the trunk "[t]o find, you know, possible violation, technical violations." She said that the "main reason" she did so was that Rivera was driving a car without her permission, but that she was also concerned that he was spending time with drug users. She told us "that led [her] to believe that something else other -- else is going on with Mr. Rivera, because [she] noticed this type of behavior, the way he was acting." She did not explain what

that "something else" was, and reasonable suspicion requires more than amorphous concerns about the way a parolee acts or behaves.

In short, our Court of Appeals in <u>Baker</u> squarely held that Pennsylvania law does not license such fishing. Taking into account the totality of the circumstances, we can only conclude that Crews did not have reasonable suspicion, supported by specific facts, to search the car trunk.

Pennsylvania law does not permit parole officers to poke around in parolees' private spaces[14] because they are curious or because they believe that parolees may be hiding something. Even though Rivera was a parolee and consented to searches, our Court of Appeals held in <u>Baker</u> that Pennsylvania law gives Rivera <u>some</u> protection against the prying eyes of his parole officer. As to the search of the car trunk, Crews stepped well over that line and violated Rivera's rights. We will therefore suppress the gun and ammunition that were seized from the trunk, as well as any statements and testimony regarding that event and those items.

---

[14] The Government does not question Rivera's standing to assert a Fourth Amendment challenge regarding the search of the trunk.

**III.** **Conclusion**

For the reasons we discuss extensively above, we will grant Rivera's motion to suppress in part and deny it in part. We will deny the motion as to the keys, wallet, and cell phone[15] that Crews seized from Rivera during the search incident to his arrest. We will, however, grant the motion as to the gun and ammunition that Crews found in the car trunk.

BY THE COURT:

\_\_\s\Stewart Dalzell

---

[15] Again, we hold only that Crews lawfully seized the cell phone from Rivera. We reserve decision as to whether she lawfully looked at the text messages that were stored in the phone.